BLOUNT, APPELLEE, *v.* SMITH ET AL., APPELLANTS.

[Cite as Blount v. Smith, 12 Ohio St. 2d 41.]

(No. 40530—Decided November 29, 1967.)

*Messrs. Dunbar, Kienzle & Murphey, Mr. James P. Jones* and *Mr. David J. Young,* for appellee.

*Messrs. Knepper, White, Richards & Miller, Mr. William E. Knepper, Mr. William L. Clark, Messrs. Halberstein & Mitchell* and *Mr. Edwin L. Mitchell,* for appellants.

SCHNEIDER, J. From February 1, 1957, to November 14, 1961, Dr. Henry C. Blount, Jr., the plaintiff-appellee here, was engaged in the practice of medicine in Marion, Ohio, as a "partner" in the Frederick C. Smith Clinic. The eleven defendants (six of whom are appellants here) are also physicians and

were all of the other members of the Clinic from February 1, 1961, to November 14, 1961.

During the latter period, the business of the Clinic was governed by a written "Articles of Copartnership," in which "net partnership income" is defined as all amounts collected by the Clinic for professional services rendered by its members, plus all amounts received by the Clinic for services rendered not involving direct professional services by any of the physicians, less all proper expenses.

All billings and collections were "made through the partnership and in its name"; all moneys received by the Clinic were deposited in the Clinic bank account; and books of account (including balance sheet, profit and loss statement, production statement, trustee account and accounts receivable statement) were kept by the business office of the Clinic and in its name.

Each physician's share of the Clinic's net income for each fiscal year was determined by crediting him with all fees collected for professional services rendered by him, plus interest on his capital investment (each originally contributed $1,-500), and by charging him with all expenses for drugs, supplies, space and equipment used by him, for all employees directly assisting him, and for his share of general operating expenses.

This income division plan did not involve the pooling of any fees for professional services. Thus, each physician's distributable net income was limited to a return on his capital contribution and to his professional fees less expenses attributable to those fees. There was, in addition, provision for nonprofessional services rendered by the Clinic, the total amount and each individual's share of which are undisclosed.

The "Articles" were to continue in effect until January 31, 1962, and thereafter from year to year unless sooner terminated under the provisions thereof.

On or about October 11, 1961, by a writing addressed "to the partners of the Frederick C. Smith Clinic," plaintiff gave the following notice:

"This is to inform you that I am withdrawing from the partnership as of the close of business on November 14, 1961.

I regret that I am unable to give longer notice of my departure but feel that you will have no difficulty in obtaining adequate radiological coverage until you can find an acceptable replacement.

"Mr. James P. Jones, my attorney, advises me that the withdrawal provisions of our partnership agreement contravene a specific section of the Ohio statutes and for that reason are unenforceable. Accordingly, I would appreciate it if you would have Mr. Mitchell, the partnership's attorney, contact Mr. Jones to work out the details of my withdrawal as promptly as possible."

Plaintiff thereupon withdrew from the Clinic as of the close of business on the date stated.

Provisions of the "Articles" relating to the rights of the plaintiff under the circumstances as related heretofore are:

"9. Termination of Partnership: The partnership herein created shall terminate upon the happening of any one of the following events:

"(a) The giving of notice, in writing, by any one of the partners to the other partners of his withdrawal from said partnership, specifying a future date to become effective as of the close of the fiscal year in which the partnership is then operating;

[There follows a description of other events which will effect a termination, *i. e.*, absence without leave for 30 days, death, total disability, bankruptcy or assignment for the benefit of creditors, and receivership.]

"* * *

"10. Rights of Withdrawing Partner: In the event of the happening of any of the events specified in 9 above, or in the event a partner, for any reason, ceases to be a member of the partnership, the remaining partners, excluding the one involved therein, shall continue partners, subject to all of the terms and provisions hereof. The liability of said remaining partners to such former partner or the estate thereof, except as hereinafter specifically provided, shall be limited to the payments thereto, within a reasonable time after the happening of any one of the events described above, of the interest of said with-

drawing, deceased, disabled, bankrupt or insolvent partner in the net worth according to the books of said partnership, as disclosed upon the balance sheet thereof as of the end of the month when such withdrawal becomes effective. It is expressly understood and agreed that the term 'net worth' as used above shall, under no circumstances, be deemed to include accounts receivable. "* * *

[Articles 11 and 12 provide for the payment, as collected, of the accounts receivables, representing fees for services rendered by a member withdrawing by reason of death or total disability, respectively, to the deceased member's estate or to the disabled member, less 20 per cent to cover the cost of collection. The obligation to collect is limited to one or three years depending upon the years of the deceased or disabled member's length of association with the Clinic.]

"13. Effect of Withdrawal: Upon payment being made of all amounts due above, the partnership consisting of the remaining partners shall thereupon and thereby be vested with full, complete and unconditional title to all partnership assets, including any interest therein theretofore belonging to said withdrawing * * * partner, and, in particular, without limiting the generality of the foregoing, the right to collect receivables arising from the services rendered by said partner and to retain the proceeds of such collections.

"It is expressly understood and agreed that *no partner withdrawing for any reason other than death or permanent total disability, as hereinbefore expressly provided for, shall have any interest in or right to accounts receivable representing uncollected fees for services rendered by said partner.*

"14. Obligations of Withdrawing Partner: A partner terminating his relationship * * * [for any reason except death or total disability] shall be deemed a withdrawing partner and to the extent possible shall give to the remaining partners at least six (6) months' notice of the effective date of his withdrawal prior to the close of the partnership's fiscal year in which it is then operating. * * *

"*A withdrawing partner who fails to give the above required six (6) months' notice or who having given said notice*

*fails to render professional services and use the physical facilities of the Clinic during the entire balance of the fiscal year in which the Clinic is then operating shall thereupon forfeit his right to any interest in any amounts thereafter received from the accounts receivable representing fees for services rendered by him and shall forfeit his right to his capital investment."* (Emphasis supplied.)

On November 16, 1961, plaintiff filed this action, praying for a declaratory judgment. All the remaining members of the Clinic answered and joined in that prayer.

Plaintiff contends that he is entitled to that portion of the accounts receivable of the Clinic representing billings for professional services performed by him, when collected, less collection expenses and the expenses properly chargeable to him under the "Articles" for the fiscal year up to the time of his withdrawal; and less any actual damages which may have been suffered as a result of his premature withdrawal by the remaining members of the Clinic who continued its business under the "Articles" for an unknown time thereafter. The gross book amount of those receivables is claimed to be approximately $40,000. This figure, although absent from the record, is admitted by appellants. In addition, plaintiff claims the right to repayment of his capital investment in the amount of $1,500.

Defendants have tendered to plaintiff the sum of $1,602.88 which they claim to be the sum of net distributable income to his credit on the books as of the date of his withdrawal and his proportionate share of interest on his invested capital for the period ending with the date of withdrawal. (The record is silent as to what expenses, if any, for such period were charged on the books.) The agreement provides for expenses to be charged at the end of the fiscal year, *i.e.,* each January 31st.

The trial court held for defendants. The Court of Appeals favored the position of plaintiff and remanded the cause for further relief based on its finding that the "forfeiture" of plaintiff's interest in his accounts receivable and his capital investment by the terms of the Articles was invalid and unenforceable. A majority of the court is unable to discern the foundation of that finding.

The record consists solely of the pleadings (in which for-

mal matters only are admitted), a stipulation containing the "Articles," the letter of Dr. Blount, hereinabove quoted, and two letters on behalf of appellants setting forth their legal contentions and their tender.

We are not apprised of the circumstances surrounding the formation of the so-called partnership or its *modus operandi*. We are unaware of its success, if any, the amount of the profit enjoyed, its expenses, the proportionate share of Dr. Blount's professional income which the receivables in question represent, their probable liquidity, their age, or whether their suggested amount is gross or net, or represents a mean or a mode.

It has been suggested unilaterally by appellants that Dr. Blount may have enjoyed immediate income on his initial association with the Clinic which did not result from services performed by him. The record does not support this suggestion, and, therefore, the same is not in order.

We are uninformed as to Dr. Blount's contribution to the Clinic (only one word in the record indicates that he is a radiologist), whether his clientele was generated primarily by him or by the Clinic, how the patients were assigned for consultation and treatment, or how the fees for his services were determined.

Moreover, we know nothing of the measure of the benefits which his association conferred upon him as compared to the loss of which *he* complains, nor of the loss to the Clinic which Dr. Blount's withdrawal may reasonably have exacted. In other words, there is nothing in the record to show that the "penalty" which Dr. Blount complains is imposed upon him does not bear a relationship to the loss which may reasonably have been sustained by the Clinic.

Therefore, we are unable to comprehend upon what basis the lower courts could have approached the disposition of this matter by the application of the familiar rules of law distinguishing liquidated damages from penalties, and we are unable to find those rules relevant to the record presented.

We are asked by plaintiff to approve the brushing aside of the explicit terms of a contract which, we must assume, in the absence of a showing to the contrary, was executed on his

part without misunderstanding or imposition. A court is required to approach that task with no less restraint than in striking down a statute.

The right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak without restraint. Responsibility for the exercise, however improvident, of that right is one of the roots of its preservation.

A rule of law which would sanction the renunciation of a bargain purchased in freedom from illegal purpose, deception, duress, or even from misapprehension or unequal advantage (*cf. Sheehy* v. *Seilon, Inc.*, 10 Ohio St. 2d 242) leads inexorably to individual irresponsibility, social instability and multifarious litigation.

We reverse the judgment of the Court of Appeals and leave these litigants in the position which their contract places them.

*Judgment reversed.*

TAFT, C. J., ZIMMERMAN, O'NEILL, HERBERT and BROWN, JJ., concur.

MATTHIAS, J., dissents.