**O'BRIEN, Plaintiff,**

v.

**OHIO STATE UNIVERSITY, Defendant.**

2006-Ohio-4346.]

Court of Claims of Ohio.

No. 2004–10230.

Decided Aug. 2, 2006.

38

Joseph F. Murray and Brian K. Murphy, for plaintiff.

Jim Petro, Attorney General, and Peggy W. Corn, Assistant Attorney General; David S. Cupps and William G. Porter, for defendant.

JOSEPH T. CLARK, Judge.

{¶ 1} On April 28, 2006, the court granted the parties' joint motion for leave to file motions for summary judgment on the issue of damages. On May 1, 2006, the parties filed cross-motions for summary judgment. On May 15, 2006, plaintiff filed a motion for leave to file a response to defendant's motion for summary judgment in excess of the court's limitation on length of briefs. Upon review, the motion for leave is granted. Defendant filed its response to plaintiff's motion for summary judgment on May 15, 2006.

{¶ 2} In their May 18, 2006 joint motion to continue the trial on the issue of damages, the parties stated that the case could be resolved without trial; that is, that there are no material facts in dispute. The motion was granted on May 22, 2006, and the trial was continued to August 28–31, 2006.

{¶ 3} The court previously determined that defendant had committed a breach of its contract with plaintiff when it dismissed him from his position as men's head basketball coach without sufficient cause to do so. In its February 15, 2006, liability decision, the court stated:

{¶ 4} "In summary, Geiger's June 8, 2004, letter speaks to a single, isolated recruiting infraction by plaintiff and plaintiff's failure to timely disclose that violation. The evidence shows that the violation consists of a loan made to the family of a prospect for humanitarian reasons. The evidence also demonstrates that such prospect was ineligible to participate in intercollegiate athletics at the time that the loan was made. Although plaintiff breached his contract by making the loan under these circumstances, the court is persuaded, given the contract language, that this single, isolated failure of performance was not so egregious as to frustrate the essential purpose of that contract and thus render future performance by defendant impossible. Because the breach by plaintiff was not a material breach, defendant did not have cause to terminate plaintiff's employ-

ment. Defendant's decision to do so without any compensation to plaintiff was a breach of the parties' agreement."

{¶ 5} Civ.R. 56(C) states:

{¶ 6} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." See, also, *Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, 821 N.E.2d 564, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

{¶ 7} Plaintiff asserts that the amount of monetary damages that he is entitled to recover as a result of the breach by defendant has been stipulated by the parties in Sections 5.2 and 5.3 of the employment contract. Those provisions read:

{¶ 8} "5.2 *Termination Other Than For Cause/Partial Liquidated Damages.* If Coach's employment hereunder is terminated by Ohio State *other than for cause* (as delineated in Section 5.1 above), Ohio State shall pay and provide to Coach, as *partial liquidated* damages, for a period not to exceed twelve (12) months (i) the full amount of Coach's then-current base salary (see Section 3.0 above) and (ii) such normal employee benefits as Ohio State then provides generally to its administrative and professional employees * * *.

{¶ 9} " * * *

{¶ 10} "Coach shall be under no obligation to mitigate Ohio State's obligations under this Section 5.2, if his employment is terminated *other than for cause* subsequent to June 30, 2003; and he shall not be accountable to Ohio State for any compensation income, benefits or profits from his personal services as a basketball coach or otherwise subsequent to termination of his employment from Ohio State regardless of when such termination occurs.

{¶ 11} "5.3 *Termination Other than for Cause/Additional Liquidated Damages.* If Coach's employment is terminated *other than for cause* (as delineated in Section 5.1 above), in addition to the liquidated damages to be paid and provided by Ohio State pursuant to Section 5.2 above, Ohio State shall compensate Coach for the loss of collateral business opportunities (whether media, public relations,

camps, clinics, apparel or similar contracts, sponsorships or any other supplemental or collateral compensation or benefit of any kind) by paying Coach *as additional liquidated damages* * * * equal to three and a half (3.5) times the product of (y) the Coach's then current base salary (see Section 3.0) and (z) the number of years remaining under the term of this agreement as the same may be extended pursuant to Section 3.3, (with monthly proration for less than any full year) if Coach's employment is terminated after June 30, 2003.

{¶ 12} "Such amount shall be paid in a lump sum within thirty (30) days after termination of Coach's employment hereunder, and shall be in lieu of any other obligation of Ohio State to Coach except as set forth in Section 5.2 above. Ohio State's obligation under this Section 5.3 shall not be subject to mitigation by Coach regardless of when Coach's employment is terminated."

{¶ 13} According to plaintiff, the determination of his damages rests only on a "simple calculation." Plaintiff claims that such calculation yields "contractually prescribed damages" of $3,571,964.45. Conversely, defendant argues that plaintiff's breach of contract and his lack of good faith regarding his loan to the Radojevic family combined with other misconduct that occurred during plaintiff's tenure as coach bar him from recovering liquidated damages.

{¶ 14} Once again, the parties could not be farther apart in their assessment of this case. Indeed, as was the case during the liability trial, the only common ground is the parties' recognition that the contract provides the legal framework for any decision that the court would render with respect to a determination of damages.

{¶ 15} Defendant's primary argument is that other misconduct on the part of plaintiff and his staff that occurred during his tenure as coach constitutes independent grounds for plaintiff's termination under the "after-acquired evidence" doctrine. Specifically, defendant argues that the improper third-party benefits provided to Slobodan Savovic during plaintiff's tenure as coach justify plaintiff's termination for cause under Section 5.1(a) of the contract because such conduct constitutes both a violation of plaintiff's duties under Section 4.1(d) and a material breach of the entire agreement.

{¶ 16} Under the after-acquired evidence doctrine, when an employer wrongfully terminates an employee but later learns that good cause for termination then existed, the after-acquired evidence doctrine operates to either lessen or bar the employee's recovery of damages. See *McKennon v. Nashville Banner Publishing Co.* (1995), 513 U.S. 352, 362–363, 115 S.Ct. 879, 130 L.Ed.2d 852. "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee

in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Id.

{¶ 17} Defendant first made this argument in a brief filed with the court following the liability trial. The court rejected defendant's argument, stating, "Defendant's argument is fatally flawed given Geiger's testimony that he and Vanatta learned of the allegations on or about May 18, 2004, more than two weeks prior to plaintiff's dismissal."

■ {¶ 18} The court remains convinced that the after-acquired evidence doctrine applies only in those cases in which the employer discovers the employee's wrongdoing after the employee is discharged or disciplined. Indeed, the after-acquired evidence doctrine has been employed as a method of barring or limiting an employee's recovery only in those instances in which the employer had been totally ignorant of the employee's misconduct before the employee was terminated. See, e.g., *Ricky v. Mapco, Inc.* (C.A.10, 1995), 50 F.3d 874, 876 (discussing the burden upon the employer to demonstrate that it was unaware of the wrongdoing at the time of termination); *Crawford Rehab. Servs. v. Weissman* (Colo.1997), 938 P.2d 540, 547 (finding that the doctrine "shields an employer from liability or limits available relief where, after a termination, the employer learns for the first time about employee wrongdoing that would have caused the employer to discharge the employee"). See, also, *Shattuck v. Kinetic Concepts* (C.A.5, 1995), 49 F.3d 1106, 1108; *Wallace v. Dunn Constr. Co.* (C.A.11, 1995), 62 F.3d 374, 379.

{¶ 19} The affidavit of Andy Geiger that was submitted by defendant in support of summary judgment establishes that Geiger, Julie Vanatta, and Heather Lyke Catalano obtained and reviewed the deposition testimony from the Salyers case more than six weeks prior to plaintiff's dismissal. The affidavit also establishes that defendant reported the Savovic allegations to the National Collegiate Athletic Association ("NCAA") on or about May 18, 2004, three weeks before dismissing plaintiff. Even a casual reading of the March 10, 2006 NCAA infractions report reveals that the NCAA relied heavily upon the allegations made by Kathy Salyers in developing the facts surrounding the Savovic matter.

{¶ 20} In an effort to create a triable issue of fact, Geiger states in his affidavit, "All of [plaintiff's] misconduct involving Savovic occurred before [plaintiff] was terminated in June 8, 2004. Only the deceptive conduct of [plaintiff] kept that misconduct relating to Savovic from becoming an additional ground for his termination in June, 2004." Geiger, however, acknowledges in this same affidavit that he first learned of the Salyers lawsuit from plaintiff in August 2003. He also admits that on March 18, 2004, 12 weeks before plaintiff's dismissal, he was informed by a third party that the Salyers lawsuit "could cause problems for [defendant's] men's basketball program." Additionally, Geiger acknowledges that

he, Vanatta, and Lyke Catalano interviewed plaintiff about the allegations made in the Salyers lawsuit on April 5, 2004.

{¶ 21} Given the facts that had become known to defendant prior to plaintiff's termination, no reasonable trier of fact could find that defendant was legally ignorant of the Slobodan Savovic matter prior to June 8, 2004. Consequently, even if the court were to conclude that the Savovic allegations, standing alone, would justify plaintiff's dismissal for cause, defendant cannot now rely on those allegations as grounds for terminating plaintiff's employment.

{¶ 22} In a similar vein, defendant contends that the March 10, 2006 NCAA infractions report conclusively establishes that pursuant to Section 5.1(b) of the contract, defendant had just cause to terminate plaintiff's employment. Defendant asks the court to reconsider its decision that was made in favor of plaintiff and to enter judgment now for defendant.

{¶ 23} It is true that in its March 10, 2006 infractions report, the NCAA concludes that plaintiff's loan to the Radojevic family was a major infraction of NCAA rules. In addition, the NCAA has imposed serious sanctions against both plaintiff and defendant arising from numerous infractions in the men's basketball program. Although the NCAA did not apportion the sanctions against the various infractions such that the court can determine precisely which sanctions relate either to the loan to the Radojevic family or to the improper benefits to Slobodan Savovic, the court will assume for the purposes of the instant decision that the loss of two scholarships and the limitation upon recruiting visits both arise from the Radojevic loan. Sanctions of this type are clearly sufficient to trigger termination for cause under Section 5.1(b) of the contract had defendant elected to proceed under that section.

{¶ 24} For the reasons that follow, however, the court finds that defendant cannot now rely on Section 5.1(b) to justify the decision to dismiss plaintiff in 2004.

{¶ 25} First, defendant's argument ignores both the language of the written notice of termination issued by defendant on June 8, 2004, and the trial testimony of defendant's president, athletic director, associate general counsel, and chief compliance officer. According to the notice of termination and those witnesses, plaintiff was terminated pursuant to Section 5.1(a) of the agreement due to a material breach. Defendant has never before relied upon Section 5.1(b) of the contract as a grounds for plaintiff's termination.

{¶ 26} The notice of termination presented to plaintiff on June 8, 2004, details the loan to the Radojevic family as the specific failure of performance by plaintiff; it identifies Section 4.1(d) as the specific contractual provision broken by plaintiff; and it cites Section 5.1(a) as the grounds for plaintiff's immediate dismissal for

cause. The unrebutted testimony of Andy Geiger was that the notice of termination was drafted primarily by defendant's lawyers and then redrafted at least once prior to its being presented to plaintiff. If defendant had wished to rely upon the provision of Section 5.1(b) in support of plaintiff's termination, defendant was contractually obligated to provide plaintiff with notice thereof.[1]

{¶ 27} Finally, the only reasonable interpretation of Section 5.1(b)[2] of the contract is that plaintiff could not be terminated for cause until the Big Ten Conference or the NCAA had either made a finding of "lack of institutional control" over the men's basketball program or had imposed certain specific sanctions. As of June 8, 2004, the NCAA had not yet issued its "Notice of Allegations," let alone made any finding regarding the men's basketball program. Because defendant made the decision to dismiss plaintiff in 2004 before any sanctions had been imposed by either the NCAA or the Big Ten Conference, defendant forfeited the right to rely upon Section 5.1(b) as cause for plaintiff's termination. It follows that defendant cannot now rely on those provisions so as to completely bar any recovery by plaintiff.

{¶ 28} Turning to the issue of damages, it is well known that parties are free to enter into contracts that contain provisions that apportion damages in the event of default. *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27, 12 OBR 23, 465 N.E.2d 392. Contracting parties may specify in advance those damages that are to be paid in the event of a breach "as long as the provision does not disregard the principle of compensation." See *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 613 N.E.2d 183, citing 3 Restatement of the Law 2d, Contracts (1981) 157, Section 356, Comment a. Such damages are

---

1. Section 5.1.1 requires the following: *"Notice.* If Ohio State wishes to exercise a right of termination for cause under this section 5.1, it *shall* give written notice to Coach of its intention to so terminate this agreement specifying the contractual provision upon which Ohio State relies therefor and the intended effective date of termination." (Emphasis added.)

2. {¶ a} "(b) [A] violation by Coach (or a violation by a men's basketball program staff member about which Coach knew or should have known and did not report to appropriate Ohio State personnel) of applicable law, policy, rule or regulation of the NCAA or the Big Ten Conference *which leads to a 'major' infraction investigation by the NCAA or the Big Ten Conference and which results in a finding by the NCAA or the Big Ten Conference of lack of institutional control over the men's basketball program or which results in Ohio State being sanctioned by the NCAA or the Big Ten Conference in one or more of the following ways* :
   {¶ b} "(i) a reduction in the number of scholarships permitted to be allocated;
   {¶ c} "(ii) a limitation on recruiting activities or reduction in the number of evaluation days;
   {¶ d} "(iii) a reduction in the number of expense-paid, official recruiting visits;
   {¶ e} "(iv) placement of the men's basketball program or Ohio State on probation;
   {¶ f} "(v) being banned from NCAA post-season play for at least one season;
   {¶ g} "(vi) being banned from regional or national television coverage for at least one basketball season with a consequent loss by Ohio State of television revenues for at least one basketball season* * *." (Emphasis added.)

typically referred to as liquidated damages. In certain circumstances, however, freedom of contract may be limited for public policy reasons when stipulated damages constitute a penalty. Id.

{¶ 29} In this case, defendant contends that plaintiff's conduct renders unenforceable the liquidated damages provisions of the agreement. The court disagrees.

{¶ 30} The test developed in Ohio to judge a stipulated damages provision was set forth in *Samson Sales*, supra, as follows: "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." Id. at paragraph one of the syllabus, citing *Jones v. Stevens* (1925), 112 Ohio St. 43, 146 N.E. 894, at paragraph two of the syllabus. Whether a stipulated-damages provision constitutes enforceable liquidated damages or an unenforceable penalty is a question of law for the court. *Lake Ridge Academy*, 66 Ohio St.3d at 380, 613 N.E.2d 183.

{¶ 31} When plaintiff and defendant entered into their contract in 1999, the damages that plaintiff might suffer if he were terminated other than for cause were "uncertain as to amount and difficult [to prove]." The liquidated damages clause expresses the parties' understanding that as coach of the men's basketball program, certain collateral business opportunities were available to plaintiff from third-party sources, and that the value of those opportunities would be difficult to predict. Additionally, the contract contains numerous incentive clauses that affect both the amount of plaintiff's compensation and the duration of his employment. Thus, there is no doubt that at the time of contracting, the amount of plaintiff's damages in the event of any breach by defendant was "uncertain as to amount and difficult [to prove]."

{¶ 32} " 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *Lake Ridge Academy*, 66 Ohio St.3d at 383, 613 N.E.2d 183, quoting *Williams v. Walker–Thomas Furniture Co.* (C.A.D.C.1965), 350 F.2d 445, 449. "A contract is unconscionable if it did not result 'from real bargaining between parties who had

freedom of choice and understanding and ability to negotiate in a meaningful fashion.' " Id., quoting *Kugler v. Romain* (1971), 58 N.J. 522, 544, 279 A.2d 640.

{¶ 33} Defendant's athletic director initiated negotiations for a new contract with plaintiff well before plaintiff's original contract was to expire, and it was defendant's associate legal counsel who took the lead in drafting the contract. Defendant's extensive experience with this type of transaction is undisputed. In short, when viewed as a whole, the contract is not manifestly unconscionable.

{¶ 34} The contract is extremely favorable to plaintiff, but it is not unreasonable. The parties in this case negotiated a contract virtually guaranteeing plaintiff that he could not be terminated for an NCAA infraction, without compensation, unless the NCAA had made a finding that plaintiff had committed a major infraction that resulted in either a finding of lack of institutional control or the imposition of serious sanctions. As was discussed extensively in the court's February 15, 2006 liability decision, defendant's right to terminate plaintiff for cause under Section 5.1(a) was limited to those instances where the breach was material. In other words, the terms of the contract made it very difficult for defendant to terminate plaintiff's employment, without a financial consequence, upon learning that plaintiff had committed an NCAA infraction.

{¶ 35} The court finds that liquidated damages in the amount prescribed by Sections 5.2 and 5.3 are not disproportionate to plaintiff's actual damages.

{¶ 36} As stated above, the formula for determining plaintiff's liquidated damages begins at Section 5.2 with a sum that represents plaintiff's yearly salary and benefits at the time of his termination. The parties agree that plaintiff's base salary in 2004 was $188,335 and that the value of his yearly employee benefits was $28,784. Additionally, plaintiff had the use of a vehicle, which has been valued at $19,432.60. Thus, liquidated damages under Section 5.2 are $236,551.60.

{¶ 37} The next step in the determination of contractual damages is to calculate plaintiff's "additional liquidated damages" pursuant to Section 5.3 of the contract. Under Section 5.3, the court must multiply, by three and one-half times, the product of plaintiff's base salary ($188,335) and the number of years remaining on the term of his contract.

{¶ 38} By its terms, plaintiff's contract was set to expire in 2008. Thus, at the time that plaintiff was terminated, there remained three years and 22 days on the term of the contract. The contract, however, contains certain achievement-based incentives that work to either increase plaintiff's yearly compensation, add years to the term, or both. The relevant provisions are as follows:

{¶ 39} "3.4 Coach shall also receive the following sums within sixty (60) days of the achievement, as supplemental compensation, in consideration of his efforts in contributing to the exceptional achievements listed below:

{¶ 40} " * * *

{¶ 41} "Awarded title of Big Ten Conference Champions or Co–Champions 10% of then-current base salary plus one (1) additional year added to term of this agreement."

{¶ 42} Applying the incentives, plaintiff concludes that there were 5 years and 22 days remaining on his contract when he was terminated. Plaintiff arrived at that figure by adding an additional year to the contract term for winning the Big Ten Conference Championship or Co–Championship in 2000 and an additional year for winning the Big Ten Conference Championship or Co–Championship in 2002.

{¶ 43} Defendant argues that plaintiff is not entitled to the additional two years because the NCAA has determined that the men's basketball team did not win those titles. The court agrees.

{¶ 44} The NCAA public infractions report states:

{¶ 45} "I. Regarding the 1999, 2000, 2001 and 2002 NCAA Division I Men's Basketball Tournaments and pursuant to NCAA Bylaw 19.5.2.2–(e)–(2) and 31.2.2.4–(b), the institution will vacate its team record as well as the individual records of the student-athlete who participated while ineligible. Further, the institution's records regarding men's basketball as well as the record of the former head coach will be reconfigured to reflect the vacated records and so recorded in all publications in which men's basketball records for the 1998–99 through the 2001–02 seasons are reported, including, but not limited to institution media guides and recruiting material and institution and NCAA archives. Further, any public reference to tournament performances won during this time shall be removed, including, but not limited to, athletics department stationery and banners displayed in public areas such as the arena in which the men's basketball team competes."

{¶ 46} The NCAA infractions report conclusively establishes that defendant's men's basketball team did not win any NCAA sanctioned contests in either the 2000 or 2002 seasons and that it was not either the Big Ten Conference Champion or Co–Champion in those years. Based upon the plain language of the contract, plaintiff did not earn any supplemental compensation in those years, and he is not entitled to the two-year extension of the contract term. The same logic dictates that the ten percent lump-sum bonus paid to plaintiff following the 2000 and 2002 seasons constitutes an overpayment. Based upon the evidence submit-

ted in connection with the motions for summary judgment, the court is unable to determine with certainty the extent of the overpayment.

{¶ 47} The court's decision to exclude the additional two years is not based upon a determination that the NCAA infractions report constitutes "after-acquired evidence" that would warrant the reduction or that plaintiff's lack of good faith and fair dealing justifies such a reduction. Rather, the decision to exclude those two years is based upon the language of the parties' 1999 agreement, which fixes plaintiff's "supplemental compensation" by reference to a third-party standard, specifically the NCAA. The NCAA has now spoken on this issue, and the contract requires that the parties remain faithful to that decision for the purposes of determining plaintiff's supplemental compensation.

{¶ 48} Therefore, the remaining term of plaintiff's contract as of June 8, 2004, was 3 years and 22 days or 3.06 years. The product of plaintiff's yearly base salary of $188,335 over 3.06 years is $576,305.10. Multiplying $576,305.10 by 3.5, as is required by Section 5.3 of the contract, results in additional liquidated damages of $2,017,067.85. Adding back the liquidated damages of $236,551.60 from Section 5.2 yields total liquidated damages of $2,253,619.45.

{¶ 49} Defendant argues that damages in this amount are disproportionate to plaintiff's real damages given the subsequent NCAA sanctions against plaintiff that limit his coaching opportunities. In the alternative, defendant asks the court to limit defendant's obligation to pay liquidated damages accordingly. The NCAA infractions report includes the following:

{¶ 50} "L. The former head coach will be informed in writing by the NCAA that, due to his involvement in certain violations of NCAA legislation found in this case, if he seeks employment or affiliation in an athletically related position at an NCAA member institution during a five-year period (March 10, 2006, to March 9, 2011), he and any involved institution shall be requested to appear before the Committee on Infractions to consider whether the member institution(s) should be subject to the show cause procedures of Bylaw 19.5.2.2–(1), which could limit athletically related duties of the head coach at any such institution for a designated period."

{¶ 51} Defendant characterizes the above sanction against plaintiff as a five-year ban on coaching at any NCAA member institution. However, no reasonable person would construe such sanction as absolute.

{¶ 52} Moreover, "when a stipulated damages provision is challenged, the court must step back and examine it in light of what the parties knew at the time the contract was formed and in light of an estimate of the actual damages caused by the breach. If the provision was reasonable at the time of formation and it bears a reasonable (not necessarily exact) relation to actual damages, the

provision will be enforced." *Lake Ridge Academy,* 66 Ohio St.3d at 382, 613 N.E.2d 183.

{¶ 53} The stipulated damages were clearly reasonable in light of the anticipated salary and collateral income that plaintiff could have earned had he remained in defendant's employ. In addition to the achievement-based incentives contained in Section 3.4, Section 3.3 of the contract contains a provision guaranteeing that plaintiff's "compensation package" will be "competitive with * * * a majority of the 16 highest paid * * * coaches in the eight (8) major athletic conferences." The contract further mandates the renegotiation of plaintiff's compensation "if it appears that [plaintiff's] compensation package falls within or below the bottom quartile of such group."

{¶ 54} The contract also recognizes that plaintiff could earn a considerable amount of collateral income in addition to his salary, benefits, and supplemental compensation. Defendant has presented the court with no evidence to support the conclusion that plaintiff would not have earned such additional income. In light of the potential salary, benefits, supplemental compensation, and collateral income that plaintiff could have earned under the agreement, the court finds that the stipulated sum bears a reasonable relation to plaintiff's actual damages.

{¶ 55} The court recognizes that, at first blush, it may seem unreasonable for a party to recover a stipulated sum in damages without any reduction arising from his own breach of contract. However, in examining the contract as a whole, it is clear that this seemingly unfair result arises from the extremely favorable provisions of the contract as it relates to plaintiff in respect to termination and not from any lack of proportionality with respect to the amount of liquidated damages.

{¶ 56} Defendant next argues that plaintiff's deceptive conduct resulted in the execution of a contract that did not reflect defendant's intentions.

{¶ 57} There is no dispute that when defendant entered into the 1999 employment contract, defendant was ignorant of the fact that plaintiff had provided a loan to the Radojevic family in 1998. It is also true that plaintiff continued to conceal this fact from defendant until such time as he was forced by circumstances to reveal it. The court has found that plaintiff's conduct in failing to disclose the loan to the Radojevic family was both a breach of Section 4.1 of the employment agreement and inconsistent with plaintiff's implied duty of good faith and fair dealing.

{¶ 58} Defendant, however, has never sought to rescind the 1999 contract on the grounds of fraud or misrepresentation and has consistently relied upon the provisions of the contract as justifying plaintiff's termination for cause. The contract itself contains no assurances or warranties from plaintiff that his

performance under the prior agreement had been consistent with NCAA regulations, and it is not known to the court whether such assurances were sought by defendant. In short, defendant has presented the court with no evidence upon which it may be inferred that the damages provisions contained in Sections 5.2 and 5.3 do not represent the parties' intent.[3]

{¶ 59} In the final analysis, the only reasonable conclusion to be drawn from the undisputed evidence is that the stipulated damages are not a penalty. Thus, the court will enforce the damages provisions as written. Applying the undisputed financial evidence submitted in this case to the clear and unambiguous language of the damages provisions of the agreement, the court finds that plaintiff is entitled to damages in the amount of $2,253,619.45 plus interest and costs.[4]

{¶ 60} The award of prejudgment interest in this case is governed by R.C. 2743.18(A) and 1343.03(A). R.C. 2743.18(A)(1) provides, "Prejudgment interest shall be allowed with respect to a civil action on which a judgment or determination is rendered against the state for the same period of time and at the same rate as allowed between private parties to a suit."

{¶ 61} Because R.C. 2743.18(A) contains the word "shall," the decision to allow prejudgment interest is not discretionary. See *Fouty v. Ohio Dept. of Youth Servs.*, 167 Ohio App.3d 508, 2006-Ohio-2957, 855 N.E.2d 909, citing *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687. "[I]n computing the amount of interest owed, the court is required to look to R.C. 1343.03(A) to determine when interest commences to run, *i.e.*, when the claim

---

**3.** Defendant also argues that plaintiff has "unclean hands." Briefly stated, the clean-hands doctrine provides that a party cannot come to the court seeking equity where that party has engaged in reprehensible conduct with respect to the subject matter of the action. See *Marinaro v. Major Indoor Soccer League* (1991), 81 Ohio App.3d 42, 610 N.E.2d 450. The doctrine of clean hands is an equitable doctrine. See *Basil v. Vincello* (1990), 50 Ohio St.3d 185, 190, 553 N.E.2d 602; *Marinaro*, 81 Ohio App.3d at 45, 610 N.E.2d 450. The general rule is that actions for monetary relief are legal, not equitable. *Feltner v. Columbia Pictures* (1998), 523 U.S. 340, 352, 118 S.Ct. 1279, 140 L.Ed.2d 438; *Monterey v. Del Monte Dunes* (1999), 526 U.S. 687, 710–711, 119 S.Ct. 1624, 143 L.Ed.2d 882. In this case, plaintiff has brought suit for monetary damages under the legal theory of breach of contract. Thus, the equitable jurisdiction of this court has not been invoked. Defendant's reliance upon the equitable defense is, therefore, misplaced. See *Civil Serv. Personnel Assn. v. Akron* (1976), 48 Ohio St.2d 25, 2 O.O.3d 98, 356 N.E.2d 300.

**4.** Defendant argues that the damages payable to plaintiff must be reduced by $1,044,284 to account for the losses it estimates that it suffered due to the NCAA sanctions. Defendant, however, cites no provision of the contract that would entitle it to such a setoff, and the court finds no provision in the contract that would require plaintiff to indemnify defendant or hold defendant harmless in the event of NCAA sanctions. As a matter of law, defendant is not entitled to a setoff.

becomes 'due and payable,' and to determine what legal rate of interest should be applied." Id.[5]

{¶ 62} In this case, the liquidated damages payable under the parties' contract became due "within thirty (30) days after termination." Since plaintiff's employment was terminated on June 8, 2004, liquidated damages became due and payable 30 days thereafter, on July 8, 2004.

{¶ 63} "The right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak without restraint. Responsibility for the exercise, however improvident, of that right is one of the roots of its preservation." *Blount v. Smith* (1967), 12 Ohio St.2d 41, 47, 41 O.O.2d 250, 231 N.E.2d 301. The court recognizes that although this may be a case where one party with equal bargaining power and sophistication did not achieve a favorable bargain, it is not the duty of this court to relieve that party of its contractual obligations simply because that party may not have fully appreciated the effect of the agreement, or because the terms of the agreement appear to favor the other party. "It does not lie within the province of the court to enter the domain of the right of parties to contract, and to grant relief because unfortunate results may have followed the execution of such contracts." *Jones*, 112 Ohio St. at 58, 146 N.E. 894. The duty of the court is to enforce the terms of the contractual bargain as made.

{¶ 64} In short, based upon the undisputed facts and as a matter of law, plaintiff shall be entitled to judgment in the amount of $2,253,619.45, plus prejudgment interest in an amount to be determined at the time the court issues a final judgment in this case. Accordingly, plaintiff's motion for summary judgment shall be granted, in part, as to those damages. There are genuine issues of fact, however, regarding the amount by which plaintiff's damages should be reduced to account for the overpayment of supplemental compensation that occurred in 2000 and 2002. Accordingly, defendant's motion for summary

---

5. {¶ a} R.C. 1343.03(A) provides the applicable rate of interest as follows:

{¶ b} "[W]hen money becomes due and payable upon any * * * contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."

{¶ c} R.C. 5703.47(B) states:

{¶ d} "On the fifteenth day of October of each year, the tax commissioner shall determine the federal short-term rate. For purposes of any section of the Revised Code requiring interest to be computed at the rate per annum required by this section, the rate determined by the commissioner under this section, rounded to the nearest whole number per cent, plus three per cent, shall be the interest rate per annum used in making the computation for interest that accrues during the following calendar year."

judgment shall be granted, in part, as it relates to a setoff, in an amount to be determined at the trial scheduled for August 28–31, 2006.

So ordered.