*50 O’Neill, J.,
concurring in syllabus and dissenting from opinion and judgment.
{¶ 78} I concur that a management company has a fiduciary relationship with a community school when it undertakes the daily operation of a community school. However, I dissent from the decision to uphold the contract, as it violates public policy and is unenforceable as a matter of law.
{¶ 79} Simply stated, defendant White Hat Management, L.L.C., voluntarily signed a contract that bound it as a fiduciary to two distinct entities: the taxpayers of the state of Ohio and the parents of the children who attend the community schools operated by White Hat. By contract, White Hat promised to safeguard and effectively utilize $90 million of public funds that were specifically set aside to educate the children of Ohio. And by contract, White Hat promised the children of Hope Academy that it, White Hat, would fulfill its fiduciary duty by providing a quality education for the sum of $90 million. The only part of that contract that was fulfilled was that White Hat thoroughly and efficiently received the $90 million. There has been no quality education, there has been no safeguarding of public funds, and there most certainly has been no benefit to the children.
{¶ 80} It is presumed that there are good community schools. These White Hat schools are not in that category. The record is clear: White Hat provides substandard service for outrageous fees in the name of profit. The schools in this case received more than $90 million in public money from 2007 to 2010. And their performance level as attested to by the state was consistently poor. Indeed, only two of the ten schools performed satisfactorily under state standards during that time frame.
{¶ 81} Against this backdrop of failed promises and termination for failure to deliver, a majority of this court intends to reward White Hat with the termination bonus that White Hat arranged for itself in the contract. Neither public policy nor contract law can ever be stretched far enough to reach that preordained result.
{¶ 82} As the lead opinion correctly concludes, the relationship between White Hat and the schools has the legal hallmarks of a fiduciary relationship. “ ‘A “fiduciary relationship” is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.’ ” Stone v. Davis, 66 Ohio St.2d 74, 79, 419 N.E.2d 1094 (1981), quoting In re Termination of Emp. of Pratt, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974). As stated in the opinion, “White Hat agreed to act on behalf of the schools to help them carry out their purpose as outlined in R.C. Chapter 3314. White Hat’s purpose, reflected in the contracts, *51 was to advance the schools’ interests.” Lead opinion at ¶ 45. White Hat was responsible for the day-to-day operation of the schools. Under the contract, White Hat was responsible for providing the training and curriculum, hiring and firing staff, purchasing the equipment, and maintaining academic standards.
{¶ 83} Under what circumstances would it be permissible for a fiduciary to convert the assets of its principal to its own use? None. Under what circumstances would it be permissible to allow a trustee to award the corpus of the trust to itself? None. Yet the lead opinion concludes that “[w]hile it appears that a fiduciary relationship was created by the conduct of the parties, we cannot say whether a fiduciary duty was breached based on the record before us.” Lead opinion at ¶ 46. And then, feigning powerlessness, the opinion rewards White Hat with the spoils not of its victory, but of its failure, all under the guise of contract law. This is not an enforceable contract. It is a fraudulent conversion of public funds into personal profit. That is not the relationship that was bargained for, and it is not one that this court can magically create to protect the profits of White Hat.
{¶ 84} Under the contract, the schools were required to turn over nearly 96 percent of the public funds that they received from the state to White Hat. It is to be remembered that if that same amount of money had gone to a traditional public school rather than a community school, it would be inconceivable to suggest that anyone would be entitled to walk away with everything purchased using those public funds. And let’s be clear here. If this contract did not exist, these public funds would remain in the public-school system, which would have then been required to have its performance monitored by the state and evaluated on an annual basis.
{¶ 85} It is irrelevant how White Hat chooses to characterize the funds received. The fact is that the money financing community schools — -whether general revenue funds or grant funds — qualifies as public money under the definition in R.C. 117.01(C). This public money was used to purchase public property to educate children. The public money used to purchase the school equipment did not magically become private money simply because it was disbursed by White Hat. Indeed, because White Hat was a duly authorized representative of the schools, it was acting as a public official. See Cordray v. Internatl. Preparatory School, 128 Ohio St.3d 50, 2010-Ohio-6136, 941 N.E.2d 1170, at ¶ 12, quoting Crane Twp. ex rel. Stalter v. Secoy, 103 Ohio St. 258, 259-260, 132 N.E. 851 (1921). Regardless of what the contract says, whether it is ambiguous or foolishly entered into,' the only way to interpret this contract to permit White Hat to keep public-school property as its own is to essentially disregard the law of Ohio.
{¶ 86} The lead opinion is absolutely correct. This contract does indeed permit an operator who is providing a substandard education to squander public money *52 and then, upon termination for poor performance, reap a bonus, paid for by public money. And that is why this contract is unenforceable as a matter of public policy and contract law.
{¶ 87} The Ohio General Assembly has unequivocally stated that public money means any money received or collected by or on behalf of a public office or representative of a public office. R.C. 117.01(C). The Ohio General Assembly has also unequivocally stated that community schools are public schools. R.C. 3314.01(B). And this court has held that a duly authorized representative of a community school is a public official and may be held strictly liable to the state for the loss of public funds. Cordray at ¶ 1. This court has also held that public property and public money in the hands of or under the control of public officials constitutes a trust fund, for which the official as a trustee should be held responsible to the same degree as the trustee of a private trust. Crane Twp. at 259-260. It simply cannot be disputed that White Hat has voluntarily become a public entity distributing public funds on behalf of the taxpayers of Ohio. It is axiomatic that one who becomes a steward of public funds also becomes the guardian of those same funds. Certainly the court majority would not countenance the prospect of $90 million being placed in front of a fan on the ledge of an open window. While from an educational standpoint the result would be the same, the waste of public funds in any instance cannot be woven into the fabric of Ohio public policy. Finally, this court has held that contracts that bring about results that the law seeks to prevent are unenforceable as being against public policy. Cincinnati City School Dist. Bd. of Edn. v. Conners, 132 Ohio St.3d 468, 2012-Ohio-2447, 974 N.E.2d 78, ¶ 17. This has been the law of Ohio until today. Until now, the public interest was not something that could be subverted or contracted away. In refusing to apply the law in this case, the opinion invalidates an extensive body of law designed to safeguard the public purse and the public interest. The failure of White Hat to properly educate these children is an outrage. Today’s opinion adds insult to that injury.
{¶ 88} In all the pages of the record in this case, it remains unclear how much of the public property of the failed schools White Hat believes it owns. Under the law it owns none. It is unfortunate, in the truest sense of the word, that these schools contracted with such a poor steward of our precious resources — our children and our tax dollars.[7] For that choice, the state has already paid dearly *53 once. Refusing to uphold the buy-back provision of this contract is neither judicial activism nor rewriting the parties’ contract in order to provide a more equitable result. Rather, it is the application of existing statutes and Supreme Court of Ohio case law to prevent theft of public property. While freedom to contract is “as fundamental to our society as the right to write and speak without restraint,” it is not unlimited. Nottingdale Homeowners’ Assn., Inc. v. Darby, 33 Ohio St.3d 32, 36, 514 N.E.2d 702 (1987), citing Blount v. Smith, 12 Ohio St.2d 41, 47, 231 N.E.2d 301 (1967). The state may interfere with this right, but only in “exceptional cases where intrusion is absolutely necessary, such as promoting illegal acts.” Id. I reject the lead opinion’s statement that the schools are seeking to rewrite the terms of the contract simply because they now seem unfair. This contract provision was illegal and unenforceable ab initio, and it is this court’s constitutional obligation to put an end to this tragic legal fiction.
{¶ 89} I would hold that a contract that vests title to public property purchased with public funds in a private entity violates public policy and is unenforceable as a matter of law. To do anything else rewards failure and encourages its repetition in the future in the name of profit. I dissent.

. The Akron Beacon Journal recently reported that since 2001, state auditors have uncovered $27.3 million in state tax dollars that have been improperly spent by charter schools, many run by for-profit companies. And these same schools have produced academic results “that rival the worst in the nation.” Livingston, Charter Schools Misspend Millions of Ohio Tax Dollars as Efforts to Police Them are Privatized, Akron Beacon Journal (May 30, 2015, updated June 3, 2015), available *53 at http://www.ohio.eom/news/local/charter-schools-misspend-millions-of-oMo-tax-dollars-as-efforts-topolice-them-are-privatized-1.596318.