******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# JAMES GOLDEN *v.* WORLDQUANT PREDICTIVE TECHNOLOGIES, LLC, ET AL.

# WORLDQUANT PREDICTIVE TECHNOLOGIES, LLC, ET AL. *v.* JAMES GOLDEN
## (AC 47099)

Alvord, Elgo and Westbrook, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgments denying his application to vacate an arbitration award and granting the defendants' application to confirm that same award, which had been issued in connection with an employment dispute. The award was issued in favor of the defendant W Co., the plaintiff's former employer, and the defendant B, a member of W Co.'s board of managers. The plaintiff claimed, inter alia, that the court improperly failed to vacate the award because the arbitrator exceeded the scope of the arbitration submission and acted in manifest disregard of the law in awarding attorney's fees and costs to the defendants. *Held*:

The plaintiff's failure to include the trial court docket number of the defendants' application to confirm the arbitration award on his appeal form did not render his appeal moot, as the defendants provided no authority indicating that a party's failure to list all of the trial court docket numbers on an appeal form in accordance with the rule of practice (§ 61-7 (a) (1)) deprived the trial court of subject matter jurisdiction, and the appeal form filed by the plaintiff provided notice to the defendants that the plaintiff was challenging the propriety of both the judgment denying his application to vacate the award and the judgment granting the defendants' application to confirm the award.

The plaintiff could not prevail on his claim that the trial court improperly failed to vacate the arbitration award because the arbitrator both exceeded the scope of the arbitration submission and acted in manifest disregard of the law in awarding attorney's fees and costs to the defendants, as the plain language of the arbitration clause in the plaintiff's employment agreement provided that the prevailing party was entitled to receive an award of attorney's fees and costs in addition to all other damages to which such party was entitled, the alleged ambiguity in the arbitration clause regarding the arbitrator's ability to award attorney's fees undermined any claim that the award fell outside of the scope of the submission, the court expressly found that the defendants were the prevailing party in the arbitration, and the plaintiff failed to demonstrate a manifest disregard of the law by the arbitrator with respect to the award of attorney's fees and costs.

The arbitrator did not manifestly disregard the law by denying the plaintiff's counterclaim alleging breach of the duty of good faith and fair dealing, as the arbitrator set forth the proper legal principles governing the duty of good faith and fair dealing and made detailed findings with respect to the conduct of both the plaintiff and W Co. based on his review and credibility assessment of the documentary and testimonial evidence presented at the arbitration proceeding.

The plaintiff failed to establish that the trial court improperly denied his application to vacate the arbitration award or improperly granted the defendant's application to confirm the award because the arbitrator acted in manifest disregard of the law by misapplying the after-acquired evidence doctrine with respect to evidence that W Co. knew the plaintiff had provided consulting services to a third party in violation of his employment agreement prior to the termination of his employment, as the plaintiff failed to overcome the high burden of showing that the governing law on waiver was well-defined, explicit and clearly applicable in situations in which both the after-acquired evidence doctrine and a reservation of rights clause were implicated, that an obvious error existed that was capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator, or that the arbitrator appreciated, yet ignored, a clearly governing legal principle.

Argued February 11—officially released September 23, 2025

*Procedural History*

Application, in the first case, to vacate an arbitration award, and application, in the second case, to confirm an arbitration award, brought to the Superior Court in the judicial district of Middlesex, where the court, *Hon. Edward S. Domnarski*, judge trial referee, granted the parties' joint motion to consolidate the actions; thereafter, the actions were tried to the court, *Shah, J.*; judgment, in the first case, denying the application to vacate the award, and judgment, in the second case, granting the application to confirm the award, from which the plaintiff in the first case and the defendant in the second case appealed to this court. *Affirmed.*

*William J. Anthony*, with whom were *Stephen J. Curley* and, on the brief, *Mathew W. Beckwith*, for the appellant (plaintiff in the first case and defendant in the second case).

*David B. Zabel,* with whom, on the brief, were *Barbara M. Schellenberg* and *Heather Spaide,* for the appellees (defendants in the first case and plaintiffs in the second case).

*Opinion*

ELGO, J. The plaintiff, James Golden, appeals from the judgments of the trial court denying his application to vacate an arbitration award and granting an application to confirm that award filed by the defendants, WorldQuant Predictive Technologies, LLC (WorldQuant), and Jeffrey Blomberg.[1] On appeal, we consider whether (1) the plaintiff's failure to strictly comply with the requirements of Practice Book § 61-7 (a) (1) renders this appeal moot, (2) the arbitrator exceeded the scope of the arbitration submission and acted in manifest disregard of the law in awarding attorney's fees and costs to the defendants, (3) the arbitrator acted in manifest disregard of the law in denying the plaintiff's counterclaim alleging breach of the duty of good faith and fair dealing, and (4) the arbitrator acted in manifest disregard of the law by misapplying the after-acquired evidence doctrine. We affirm the judgments of the trial court.

This appeal originates in an employment dispute. In May, 2018, WorldQuant hired the plaintiff as its chief executive officer. The plaintiff's employment was governed by a written agreement, which the plaintiff signed on May 22, 2018 (employment agreement). Pursuant to that agreement, the plaintiff's compensation included a

---

[1] There are two actions underlying this appeal that were joined for trial. The action seeking to vacate the arbitration award was commenced by Golden and named WorldQuant and Blomberg as defendants. The action seeking to confirm the arbitration award was commenced by WorldQuant and Blomberg and named Golden as the defendant. For clarity in this opinion, we refer to Golden as the plaintiff and to WorldQuant and Blomberg collectively as the defendants and individually as WorldQuant and Blomberg. At all relevant times, Blomberg was a member of WorldQuant's board of managers.

base salary of $800,000 per year, a discretionary annual bonus, and 5000 "Incentive Units," which amounted to a 5 percent equity stake in WorldQuant.[2] The employment agreement also contained an arbitration clause that pertained to any disputes regarding the plaintiff's employment.[3]

On April 21, 2021, WorldQuant terminated the plaintiff's employment.[4] WorldQuant then filed a demand

---

[2] As the arbitrator found in his September 7, 2022 decision, the incentive units described in the employment agreement provided the plaintiff with a 5 percent equity interest in WorldQuant. The plaintiff's eligibility for that additional compensation was memorialized in a separate agreement between the parties, titled "Restricted Unit Agreement," which provided that the plaintiff's receipt of the incentive units was subject to a three year vesting schedule.

[3] The arbitration clause provides in relevant part: "Arbitration. . . . By executing below, you agree that any dispute, controversy or claim arising out of or relating to this [a]greement and/or your employment with [WorldQuant] shall be submitted to and decided by binding arbitration as the exclusive means of resolution thereof. Subject to the terms below, such arbitration shall be administered by a single arbitrator appointed in accordance with the rules and procedures of the American Arbitration Association and shall be conducted in accordance with the American Arbitration Association rules and procedures and the substantive laws of the State of Connecticut, without regard to the state's conflicts of laws provisions. Such arbitration shall take place in Fairfield County, Connecticut at a specific location reasonably determined by such appointed arbitrator, and each of you and [WorldQuant] hereby consents to such forum and venue for arbitration hereunder. Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator. Any arbitral award determination shall be final and binding upon you and [WorldQuant]. No arbitrator shall be empowered to award punitive, consequential or exemplary damages, and you hereby waive any right to recover any such damages; provided, that the party prevailing in any such arbitration proceeding shall be entitled to receive, in addition to all other damages to which such party may be entitled, the costs incurred by such party in connection with such arbitration, including, without limitation, reasonable attorneys' fees, costs and expenses."

[4] The notice of termination sent to the plaintiff stated in relevant part: "Regrettably, your employment with [WorldQuant] has been terminated for cause effective April 21, 2021 . . . due to your gross negligence, mismanagement, fraud, dishonesty, and other discriminatory and abhorrent conduct. Your conduct violated your fiduciary duties owed to [WorldQuant], as well as [WorldQuant's] policies and procedures and, possibly, state and federal laws.

"In addition to your flagrant and repeated abuse of [WorldQuant's] [e]xpense [r]eimbursement [p]olicy to pay for personal charges unrelated

for arbitration on May 6, 2021, in which it sought a declaratory judgment that the plaintiff's employment had been terminated for cause[5] and asserted claims of breach of fiduciary duty and breach of the duty of loyalty against him. In response, the plaintiff filed an answer that was accompanied by several affirmative defenses, counterclaims against WorldQuant, and third-party claims against Blomberg.[6]

to [WorldQuant] business, [WorldQuant] has learned that you knowingly and intentionally provided false or misleading information to the [b]oard of [m]anagers and [WorldQuant's] founder about personnel matters (among other things) on multiple occasions. Upon subsequent investigation, it was also determined that you made inappropriate and disparaging comments at work regarding [WorldQuant's] founder in the presence of other employees. You have also made inappropriate and harassing comments to employees. Such conduct is categorically unacceptable and in violation of numerous [WorldQuant] policies and state and federal law. Additionally, audio recordings of you made by a former employee demonstrate that you lied to [WorldQuant's] lawyers and management about personnel and contractual matters that resulted in significant legal exposure and the payment to this employee of monies not otherwise due to her based on your conduct. Accordingly, [WorldQuant] is terminating your employment for [c]ause as defined in and in accordance with the terms of your [e]mployment [a]greement . . . .

"Please be advised that [WorldQuant] reserve[s] all of its rights under the [e]mployment [a]greement . . . at law or otherwise, and nothing in this letter shall be construed as a modification, release or waiver of any rights or claims."

[5] The employment agreement contains a definition of the term "[c]ause," providing: " 'Cause' shall mean (i) your material breach of [the employment agreement], a material violation by you of any of [WorldQuant's] policies or procedures or your refusal to follow or your knowing disregard of reasonable instructions by [WorldQuant] consistent with this [employment agreement]; (ii) fraud, gross negligence or willful misconduct in the performance of your obligations or with respect to the business of [WorldQuant] or its Affiliates (as defined on Schedule 1); or (iii) you are indicted for commission of any felony, or of a misdemeanor arising out of volitional behavior involving moral turpitude."

[6] The plaintiff alleged claims of breach of contract, breach of the duty of good faith and fair dealing, promissory estoppel, wrongful discharge, failure to pay wages weekly, and failure to pay wages upon termination against WorldQuant. The plaintiff also alleged conversion and an additional claim of failure to pay wages against both WorldQuant and Blomberg. During the arbitration proceeding, the plaintiff withdrew his claims of failure to pay wages weekly and failure to pay wages upon termination against WorldQuant. The parties also stipulated that the third-party claims asserted

In January, 2022, WorldQuant filed a motion to amend its demand for arbitration to augment its existing claims and to add a breach of contract claim regarding consulting services that the plaintiff performed for a company known as HX Square, Inc. (HXS), while employed by WorldQuant. The arbitrator granted that motion on February 7, 2022.

As the trial court noted in its memorandum of decision, the parties thereafter "were involved in an arbitration conducted by the American Arbitration Association . . . . After discovery, which included the production of thousands of pages of documents and ten prehearing depositions, the parties filed cross motions for summary judgment with the permission of the arbitrator. On April 26, 2022, the arbitrator issued his decision on the cross motions for summary judgment (summary judgment decision) which (1) granted summary judgment in favor of WorldQuant dismissing [the plaintiff's] third counterclaim for promissory estoppel; (2) granted summary judgment in favor of WorldQuant and Blomberg dismissing [the plaintiff's] sixth counterclaim for conversion; and (3) granted summary judgment in favor of Blomberg on [the plaintiff's] fourth counterclaim for alleged failure to pay wages. Except as partially granted in favor of WorldQuant and Blomberg, the parties' cross motions for summary judgment were denied. Because not all of the claims and counterclaims asserted by the parties had been resolved by the summary judgment decision, a nine day evidentiary hearing was conducted by the arbitrator from May 9, 2022, through May 19, 2022. Ten witnesses testified during the hearing, and the parties submitted approximately 450 exhibits . . . . Near the end of the arbitration hearing, the parties agreed to, and the arbitrator approved, bifurcation of

against Blomberg, as well as any defenses and claims that he may assert against the plaintiff, would be subject to the arbitration provision in the employment agreement.

the arbitrator's consideration of the issues raised concerning liability and damages. Accordingly, the parties submitted posthearing briefs and reply briefs on the liability issues to the arbitrator in July and August, 2022. On September 7, 2022, the arbitrator issued his interim decision of liability (liability decision).

"In the liability decision, the arbitrator granted WorldQuant's claims against [the plaintiff], finding that WorldQuant's termination of [the plaintiff's] employment was for cause, that [the plaintiff] breached his employment agreement with WorldQuant, and that [the plaintiff] breached his fiduciary duties and duty of loyalty to WorldQuant.[7] The arbitrator also denied all of [the plaintiff's] remaining counterclaims against WorldQuant. Following the liability decision, the parties submitted to the arbitrator additional extensive briefing regarding WorldQuant's claims for damages and expenses of the arbitration, including attorney's fees, and argued the issues at a hearing held by the arbitrator on December 13, 2022. On December 27, 2022, the arbitrator issued his decision on damages and attorney's fees, costs, and expenses (damages decision). As a result of the summary judgment decision, the liability decision, and the damages decision . . . all of WorldQuant's claims against [the plaintiff] in the arbitration were granted; all of [the plaintiff's] counterclaims and third-party claims against WorldQuant and Blomberg in the arbitration were denied and dismissed. The arbitration award required [the plaintiff] to pay to WorldQuant the amount

_____

[7] In the liability decision, the arbitrator found that the plaintiff had materially breached the employment agreement and that the termination of his employment was for cause. In light of those determinations, the arbitrator concluded that the plaintiff had "forfeited his unvested and vested equity" in WorldQuant. See footnote 2 of this opinion. The arbitrator concluded by noting that WorldQuant "is the prevailing party and is entitled to remedies. The holding that [the plaintiff] forfeits his vested and unvested restrictive units is one such remedy. . . . [O]ther damages will be reduced because of [WorldQuant's] own conduct."

of $690,578.60 within thirty days after December 27, 2022.'"[8] (Citation omitted; footnote added.)

On January 25, 2023, the plaintiff filed an application with the Superior Court to vacate or modify the arbitration award pursuant to General Statutes § 52-418 (a) (4),[9] in which he alleged that the arbitrator had acted in manifest disregard of the law.[10] On February 23, 2023, the defendants filed an application for an order confirming the arbitration award. The parties then filed a joint request to consolidate their respective applications to confirm and to vacate the arbitration award, which the court granted.

The parties thereafter submitted memoranda of law, and the court held a hearing on the applications to confirm and to vacate the arbitration award on August 1, 2023. By memorandum of decision dated September 29, 2023, the court granted the defendants' application

[8] We note that the defendants had requested a total of $2,820,169.13 in damages, attorney's fees, costs and expenses. In the damages decision, the arbitrator noted that he was exercising his equitable power to reduce the total relief provided to the defendants because they "did not have 'clean hands' . . . ." The arbitrator explained that "this reduction in the damages and fees, costs and expenses sought must be viewed in the context of what already has been awarded as a remedy in the [liability decision]. . . . [The plaintiff was] stripped of his equity [in WorldQuant], which arguably was the largest component of his compensation . . . ."

[9] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[10] As our Supreme Court has observed, "[a] proceeding to vacate an arbitration award is not a civil action, but is rather a special statutory proceeding." *Middlesex Ins. Co.* v. *Castellano*, 225 Conn. 339, 344, 623 A.2d 55 (1993).

to confirm and denied the plaintiff's application to vacate. The court rendered judgment accordingly in both cases, and this appeal followed.

I

We begin by addressing an issue that implicates the subject matter jurisdiction of this court. In their appellate brief, the defendants submit that the plaintiff's failure to strictly comply with the requirements of Practice Book § 61-7 (a) (1) renders the present appeal moot. We disagree.

"Mootness presents a legal question and implicates this court's subject matter jurisdiction, a threshold matter to resolve. . . . This court has a duty to dismiss cases over which it lacks subject matter jurisdiction, which cannot be conferred by the consent of the parties." (Citation omitted.) *Gladstein* v. *Goldfield*, 325 Conn. 418, 424, 159 A.3d 661 (2017). "[T]he question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, *at any time* . . . ." (Emphasis in original; internal quotation marks omitted.) *M&T Bank* v. *Lewis*, 349 Conn. 9, 20, 312 A.3d 1040 (2024). Our review of the question of mootness is plenary. *State* v. *Rodriguez*, 320 Conn. 694, 699, 132 A.3d 731 (2016).

"Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by the judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . [I]t is not the province of

appellate courts to decide moot questions, disconnected from the granting of actual relief or from *the determination of which no practical relief can follow.* . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Citation omitted; emphasis in original; internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 754–55, 183 A.3d 611 (2018).

The defendants' mootness claim is predicated on the plaintiff's failure to comply with Practice Book § 61-7 (a) (1), which provides: "Two or more parties in the same case may appeal jointly or severally. Separate cases heard together and involving at least one common party may as of right be appealed jointly, provided all the trial court docket numbers are shown on the appeal form (JD-SC-033)." It is undisputed that the plaintiff did not strictly comply with that rule of practice, as he did not list the docket number for the defendants' application to confirm on his November 14, 2023 appeal form. The defendants contend that this omission indicates that the plaintiff "failed to appeal the trial court's decision" to confirm the arbitration award and, therefore, "there is no practical relief that can be granted to him in this appeal since an identical judgment remains in place and in effect in the action to confirm." We do not agree.

As the November 14, 2023 appeal form filed with this court plainly indicates, the plaintiff brought this appeal from "[t]he decision and judgment denying the application to vacate the arbitration award *and* granting the application to confirm the arbitration award." (Emphasis added.) The defendants, therefore, were on notice that the plaintiff intended to challenge the propriety of both judgments in this appeal.[11]

---

[11] The plaintiff likewise argues in his principal appellate brief that "[t]he trial court erred in denying [his] application to vacate the arbitration award rendered in WorldQuant's favor and granting [the defendants'] application

It bears emphasis that, although the plaintiff's application to vacate and the defendants' application to confirm were filed as separate cases in the Superior Court, they were ordered consolidated at the request of the parties. Moreover, following a joint hearing, the court issued a single memorandum of decision that resolved both cases and listed their respective docket numbers.

We recognize that the plaintiff did not list the trial court docket number for the defendants' application to confirm on his November 14, 2023 appeal form, as required by Practice Book § 61-7 (a) (1). Because that deficiency is technical in nature, we decline to exalt form over substance due to the plaintiff's failure to strictly comply with that rule of practice when it is undisputed that the plaintiff expressly stated on that appeal form that he was appealing from *both* the judgment denying his application to vacate and the judgment granting the application to confirm. See *State* v. *Rios*, 30 Conn. App. 712, 714, 622 A.2d 618 (1993) (although appellate court does not condone failure to comply with rule of practice, it will "not exalt form over substance if the deficiency [is] of a technical nature"); see also *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 34, 848 A.2d 418 (2004) ("[t]his court repeatedly has eschewed applying the law in such a hypertechnical manner so as to elevate form over substance").

The defendants have provided no authority, nor are we aware of any, in which a court of this state has concluded that a party's failure to list all trial court docket numbers on an appeal form in accordance with

to confirm the award." By way of relief, the plaintiff asks this court to "reverse the trial court's decision denying [his] application to vacate and granting [the defendants'] application to confirm . . . ." The basis of the plaintiff's challenge to both judgments is identical—namely, that the arbitration award was made in manifest disregard of the law.

Practice Book § 61-7 (a) (1) deprived the court of subject matter jurisdiction. Because the appeal form filed by the plaintiff provided notice to the defendants that the plaintiff was challenging the propriety of both the judgment denying his application to vacate and the judgment granting the defendants' application to confirm the arbitration award, we conclude, on the undisputed facts of this case, that the plaintiff's failure to include the docket number for the defendants' application to confirm does not render the present appeal moot.

## II

We next consider the plaintiff's claims that the court improperly failed to vacate the arbitration award because the arbitrator both exceeded the scope of the arbitration submission and acted in manifest disregard of the law in awarding attorney's fees and costs to the defendants. We disagree.

At the outset, we note that the plaintiff predicated his application to vacate on § 52-418 (a) (4); see footnote 9 of this opinion; and alleged that the arbitrator exceeded his authority in rendering the arbitration award. As our Supreme Court has explained, "a claim that the arbitrators have 'exceeded their powers' may be established under § 52-418 in either one of two ways: (1) the award fails to conform to the submission, or, in other words, falls outside the scope of the submission; or (2) the arbitrators manifestly disregarded the law." *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 85, 881 A.2d 139 (2005). When a party raises both of those issues, as the plaintiff does here, they "require independent consideration." Id., 88.

In addition, we note that the appellate courts of this state engage in de novo review of "a trial court's decision . . . [on] whether an arbitration award violates

the proscriptions of § 52-418 . . . ."[12] *Ahmed* v. *Oak Management Corp.*, 348 Conn. 152, 176, 302 A.3d 850 (2023), cert. denied, U.S. , 144 S. Ct. 2520, 219 L. Ed. 2d 1200 (2024). The de novo standard applied in the context of arbitration proceedings is fundamentally distinct from that normally applied in other judicial contexts, where no deference is accorded. See, e.g., *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 51–52, 757 A.2d 501 (2000) (noting that "[o]ur legal system . . . ordinarily give[s] great deference . . . to both the factual and legal determinations of the arbitrators" and that, even when appellate review "requires a de novo determination by the court . . . we give deference to the arbitrator's factual determinations" (citation omitted)). As our Supreme Court observed, "what . . . de novo review [in the arbitration context] encompasses depends on which ground for vacating an award is at issue. Irrespective of which ground is at issue, however, a court must afford substantial deference to the arbitrator's interpretation of the scope and meaning of the agreement's terms. . . . Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or

---

[12] Because our review of the plaintiff's claims regarding the award of attorney's fees and costs is de novo, we disagree with the defendants that the record is inadequate for review. We recognize that the plaintiff distinctly challenged the propriety of the award of attorney's fees and costs in his application to vacate, his memorandum of law in support thereof, and his argument at the August 1, 2023 hearing. We also recognize that the court did not expressly address those claims in its September 29, 2023 memorandum of decision.

At the same time, the lack of an explicit statement of the court's reasoning for rejecting those claims does not inhibit our review thereof. Appellate review of a claim that an arbitration award either exceeded the scope of the submission or was made in manifest disregard of the law is identical to that of the trial court. Like the trial court, an appellate court engages in de novo review and does not "review the evidence considered by the arbitrators" or "review the award for errors of law or fact." (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 80. Accordingly, the failure of the trial court to set forth its reasoning with respect to these claims does not preclude our review on appeal.

applying the contract must stand, regardless of a court's view of its (de)merits." (Citation omitted; internal quotation marks omitted.) *Ahmed* v. *Oak Management Corp.*, supra, 176–77.

The application of such deference comports with the precept that, "[w]hen arbitration is created by contract, we recognize that its autonomy can only be preserved by minimal judicial intervention. . . . Because the parties themselves, by virtue of the submission, frame the issues to be resolved and define the scope of the arbitrator's powers, the parties are generally bound by the resulting award. . . . Since the parties consent to arbitration, and have full control over the issues to be arbitrated, a court will make every reasonable presumption in favor of the arbitration award and the arbitrator's acts and proceedings. . . . The party challenging the award bears the burden of producing evidence sufficient to invalidate or avoid it . . . ." (Internal quotation marks omitted.) *Bridgeport* v. *Kasper Group, Inc.*, 278 Conn. 466, 474, 899 A.2d 523 (2006). Accordingly, our courts "afford an unparalleled level of deference to the arbitrator and construe the grounds for vacatur quite narrowly." *Ahmed* v. *Oak Management Corp.*, supra, 348 Conn. 183; see also *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 80 (" '[j]udicial review of arbitral decisions is narrowly confined' ").

Moreover, with respect to the factual findings and legal conclusions drawn by the arbitrator, we note that an application to vacate predicated on claims that an arbitrator exceeded the scope of the submission or acted in manifest disregard of the law "presupposes an unrestricted submission." *Blondeau* v. *Baltierra*, 337 Conn. 127, 154, 252 A.3d 317 (2020); accord *Toland* v. *Toland*, 179 Conn. App. 800, 807 n.5, 182 A.3d 651 ("analysis under § 52-418 . . . applies when a party attempts to vacate *unrestricted* submissions" (emphasis in original)), cert. denied, 328 Conn. 935, 183 A.3d

1174 (2018). In such instances, our Supreme Court has applied "the standard of review applicable to unrestricted submissions"; *Blondeau* v. *Baltierra*, supra, 154; pursuant to which "courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact."[13] (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 80. With those principles in mind, we turn to the plaintiff's claims.

## A

The plaintiff claims that the court improperly failed to vacate the arbitration award because the arbitrator exceeded the scope of the arbitration submission in awarding attorney's fees and costs to the defendants. In the present case, the arbitration clause in the employment agreement; see footnote 3 of this opinion; constitutes the written submission to arbitration. See *Ahmed* v. *Oak Management Corp.*, supra, 348 Conn. 186–87.

"The standard for reviewing a claim that the award does not conform to the submission requires what we have termed in effect, de novo judicial review. . . . The de novo label in this context means something very different from typical de novo review because review under this standard and in this setting is limited to a comparison of the award to the submission. Our inquiry generally is limited to a determination as to whether the parties have vested the arbitrators with the authority to decide the issue presented or to award the relief conferred. . . . In making this determination, the court may not engage in fact-finding by providing an independent interpretation of the contract, but simply is charged with determining if the arbitrators have ignored their obligation to interpret and to apply the contract as written. . . . To justify vacating an award on the

---

[13] In his appellate reply brief, the plaintiff states that he does not dispute "the facts found by the arbitrator."

ground that the award exceeds the scope of the submission, we must determine that the award *necessarily* falls outside the scope of the submission." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Blondeau* v. *Baltierra*, supra, 337 Conn. 155–56.

On appeal, the plaintiff claims that the award of attorney's fees and costs exceeded the scope of the submission. The language of the arbitration clause indicates otherwise. It provides in relevant part: "[A]ny dispute, controversy or claim arising out of or relating to this [a]greement and/or your employment with [WorldQuant] shall be submitted to and decided by binding arbitration as the exclusive means of resolution thereof. . . . Any arbitral award determination shall be final and binding upon you and [WorldQuant]. No arbitrator shall be empowered to award punitive, consequential or exemplary damages, and you hereby waive any right to recover any such damages; provided, that the party prevailing in any such arbitration proceeding shall be entitled to receive, in addition to all other damages to which such party may be entitled, the costs incurred by such party in connection with such arbitration, including, without limitation, reasonable attorneys' fees, costs and expenses." By its plain language, that clause provides that the prevailing party is "entitled" to receive an award of attorney's fees and costs "*in addition to* all other damages to which such party may be entitled . . . ." (Emphasis added.) In light of that unambiguous language, we cannot conclude that the award of attorney's fees and costs necessarily exceeded the scope of the submission.

Even if the arbitration clause was ambiguous as to whether attorney's fees and costs are permitted in light of the prohibition of punitive damages, the plaintiff still could not prevail. As the Supreme Court has observed, "[t]o justify vacating an award . . . we must determine

that the award *necessarily* falls outside the scope of the submission. . . . Here, the ambiguity [in the submission] as to the parties' intent precludes such a result." (Citation omitted; emphasis in original.) *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 98–99. Thus, even if an ambiguity exists in the arbitration clause regarding the arbitrator's ability to award attorney's fees and costs, as the plaintiff steadfastly has argued,[14] that ambiguity undermines any claim that the arbitration award in the present case necessarily fell outside the scope of the submission. See id. Accordingly, the plaintiff's claim fails.

B

The plaintiff also argues that the arbitrator acted in manifest disregard of the law in awarding attorney's fees and costs to the defendants. That claim requires a different analysis than the preceding one.

As our Supreme Court has explained, "[m]anifest disregard of the law is an extremely deferential standard of review. [T]he manifest disregard of the law ground for vacating an arbitration award is narrow and should be reserved for circumstances of an arbitrator's extraordinary lack of fidelity to established legal principles. . . . This level of deference is appropriate because the parties voluntarily have chosen arbitration as a means to resolve their legal dispute. . . . As an essential component of that choice, they have agreed to bypass the

---

[14] At the August 1, 2023 joint hearing on the plaintiff's application to vacate and the defendants' application to confirm the arbitration award, the plaintiff's counsel argued that an ambiguity existed in the arbitration clause due to the existence of both a provision proscribing punitive damages and a provision authorizing attorney's fees and costs. He stated: "There is a clear ambiguity on the face of this contract permitting attorney's fees versus prohibiting punitive damages . . . ." The plaintiff's counsel also argued that "[t]he arbitrator failed to reconcile this ambiguity in awarding [the defendants] attorney's fees and costs." The plaintiff renewed that argument in his principal appellate brief.

usual adjudicative apparatus, including its conventional appellate features, for the advantages that accompany private arbitration. To borrow a phrase from the marriage ceremony, that choice is made for better or for worse, which, in this context, means that the arbitrator's decision is final and binding unless it is manifestly, obviously, and indisputably wrong. Review by a judicial authority is not forfeited entirely, but it is conducted under a different and far less rigorous level of scrutiny.

"Under this highly deferential standard . . . our precedent instructs that three elements must be satisfied before we will vacate an arbitration award on the ground that the arbitration panel manifestly disregarded the law: (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is [well-defined], explicit, and clearly applicable. . . . [E]very reasonable presumption and intendment will be made in favor of the [arbitration] award and of the arbitrators' acts and proceedings." (Citations omitted; internal quotation marks omitted.) *Blondeau* v. *Baltierra*, supra, 337 Conn. 161–62.

The plaintiff argues that the arbitrator manifestly disregarded the law by awarding attorney's fees and costs because WorldQuant was not the prevailing party. That claim requires little discussion. In the liability decision, the arbitrator found in favor of the defendants on *all* of their claims and denied *all* of the counterclaims raised by the plaintiff. Moreover, the court expressly found that the defendants were the "prevailing party" in this arbitration. By way of relief, the arbitrator ordered the forfeiture of the plaintiff's equity interest in WorldQuant. See footnotes 2, 7 and 8 of this opinion.

The foregoing belies any claim that the defendants were not the prevailing party in this arbitration.

Those determinations also undermine the plaintiff's contention that the arbitrator manifestly disregarded the law by awarding attorney's fees and costs in the absence of an award of damages. First, as a factual matter, the plaintiff is mistaken. In his principal appellate brief, the plaintiff conflates the damages element of breach of contract, breach of fiduciary duty, and breach of the duty of loyalty actions with the relief ultimately awarded by the arbitrator. The plaintiff argues, in syllogistic fashion, that (1) damages are essential elements of those actions, (2) the arbitrator awarded no damages specific to those actions in the damages decision, and (3) as a result, the damages element of those actions was not established in this case. The fallacy in that argument is the uncontroverted fact that the primary relief granted to the defendants was the forfeiture of the plaintiff's equity interest in WorldQuant. As the arbitrator noted in the damages decision, the consequence of his decision in favor of the defendants on all claims was that the plaintiff "is stripped of his equity [in WorldQuant], which arguably was the largest component of his compensation . . . ."[15] The arbitrator further explained that he had reduced the award of damages to WorldQuant due to the sizeable relief that already had been granted to WorldQuant in the liability decision. As the arbitrator stated, his "reduction in the damages . . . sought [by the defendants] must be viewed in the context of what already has been awarded [to the defendants] as a remedy"—namely, the loss of that significant equity interest. That explication indicates that the arbitrator concluded that damages were warranted in light of the

---

[15] In opposing the defendants' request for more than $2.8 million in damages, attorney's fees and costs, the plaintiff claimed that it " 'shocks the conscience' especially in light of the fact that the [liability decision] already stripped [him] of his vested and unvested equity [in WorldQuant]."

plaintiff's breaches of the employment contract, his fiduciary duty, and his duty of loyalty, but that the arbitrator opted to reduce those damages in light of his decision to order the forfeiture of the plaintiff's equity interest in WorldQuant.

The plaintiff's claim also incorrectly presumes that an award of damages is a necessary prerequisite to an award of attorney's fees and costs. The plain language of the arbitration clause does not support that contention; rather, it explicitly provides that "the party prevailing in any such arbitration proceeding shall be entitled to receive, in addition to all other damages to which such party may be entitled, the costs incurred by such party in connection with such arbitration, including, without limitation, reasonable attorneys' fees, costs and expenses." In agreeing to that provision, the parties memorialized the prevailing party's right to receive attorney's fees and costs in addition to any other damages that may be awarded by an arbitrator. The inclusion of such a provision in the employment contract is consistent with Connecticut law.[16] Accordingly, the plaintiff has not demonstrated a manifest disregard of the law by the arbitrator with respect to the award of attorney's fees and costs.

---

[16] As our Supreme Court has observed, "[t]he general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . Connecticut adheres to the American rule. . . . There are few exceptions. [One] example [is] where a specific contractual term provides for the recovery of attorney's fees and costs . . . ." (Citations omitted; internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 311, 685 A.2d 305 (1996); see also *McCarter & English, LLP* v. *Jarrow Formulas, Inc.*, 351 Conn. 186, 209–10, 329 A.3d 898 (2025) (declining to depart from "the majority rule precluding an award of punitive damages in a breach of contract action" but emphasizing that "there were alternative approaches [the plaintiff] could have pursued in an attempt to protect its interests," including inserting "a provision in a [contract] with [the defendant] addressing potential remedies should [the defendant] breach [the] contract").

### III

The plaintiff also claims that the court improperly failed to vacate the arbitration award because the arbitrator acted in manifest disregard of the law by denying his breach of the duty of good faith and fair dealing counterclaim. We do not agree.

"[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 16 n.18, 938 A.2d 576 (2008). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004).

"Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review." *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 837, 3 A.3d 992 (2010). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation

marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, supra, 269 Conn. 432.

The following additional facts, as found by the arbitrator, are relevant to this claim. The plaintiff's "actions and misrepresentations" surrounding the termination of the employment of Diana Novick, WorldQuant's principal salesperson, were "the triggering event for why [WorldQuant] had reason to lose confidence in [the plaintiff] and [c]ause for his discharge." As the arbitrator found: "Starting in late-2019 and then in mid-2020, [the plaintiff] expressed his dissatisfaction with Novick's performance to [legal counsel Joshua Hawks-Ladds] and Human Resources Vice President [Jordana] Upton. . . . On December 3, 2020, [the plaintiff] gave a year-end performance review to Novick. . . . Novick secretly recorded the meeting. . . . The performance review was positive and included detailed discussions of Novick's compensation and equity in [WorldQuant]. Yet, shortly after the meeting, [the plaintiff] planned to terminate Novick's employment. . . . [The plaintiff] also hired a new Director of Sales . . . who started in January, 2021. On March 4, 2021, [WorldQuant] terminated Novick. The decision was made by [the plaintiff] in consultation with . . . [Upton and Hawks-Ladds].

"On March 15, 2021, Novick's attorney, Salvatore Gangemi, sent a letter that challenged her termination and requested additional severance. . . . The letter recites Novick's performance, the compensation and equity discussions, and how she believed [the plaintiff] and [WorldQuant] had limited her ability to be an effective salesperson. The letter also states that Novick observed 'circumstances that confirmed [the plaintiff's] unlawful biases, based on gender, religion and age.' The letter provided examples of the alleged discriminatory conduct . . . . [WorldQuant] asked [the plaintiff] to address Novick's attorney's letter, which he did, explaining and strongly denying the allegations. . . .

Hawks-Ladds then sent a response to the demand letter from [Gangemi]; the seven page letter denied the allegations against [the plaintiff] and explained that Novick's poor performance was the cause for her termination. . . .

"In response, [Gangemi] claimed that [WorldQuant's] letter contained misrepresentations and lies. Gangemi also revealed that Novick had recordings that proved what [WorldQuant] said was false. On April 7, 2021, Gangemi provided the recordings to [WorldQuant]. . . . Blomberg testified that the recording was shocking, as did Hawks-Ladds. . . . They both realized that [the plaintiff] had not been truthful about Novick, and he had deceived them about what he had said about Novick's performance and her entitlement to equity. As a result, [WorldQuant] recognized it had possible exposure and changed its negotiating posture. [WorldQuant] then offered [Novick] eight months of severance, additional commissions and payment of [her] attorney's fees. The result was that the severance agreement with Novick paid her four times the original severance offer. The agreement was reached on April 13, 2021. . . .

"As part of the discussions leading to the settlement agreement with Novick, her counsel demanded protection in the event that [the plaintiff] brought some action against her. This resulted in a supplement to the agreement with Novick. . . . The supplement . . . required indemnification for any claims [the plaintiff] might make against Novick. Hawks-Ladds, Blomberg and Upton exchanged several emails about the final Novick agreement and the supplement. . . . Some of these emails were sent to [the plaintiff], but not all. On April 10, 2021, Hawks-Ladds wrote: 'Attached is a new [s]eparation [a]greement and a [s]upplement to the [a]greement for you to review. <u>Do not send to [the plaintiff]</u>. Once you approve these, I will send the [s]eparation

[a]greement to [the plaintiff] (and not the [s]upplement) and I will note the promises [the plaintiff] is making in the [s]eparation [a]greement—I will explain to him that we need these for a deal to be made (innocuous, etc.). Please provide any changes. I am supposed to be on vacation, so want to get this done ASAP and then sent to Gangemi.' . . .

"[The plaintiff] contends he never saw the supplement although he did see the 'Do not show to [the plaintiff]' reference at the bottom of an email chain that [WorldQuant] says was inadvertently forwarded to [the plaintiff]. . . . [The plaintiff] also testified that he did not have his own counsel review the 'substance' of the Novick agreement he was asked to sign. Yet the facts are otherwise: the supplement is mentioned in the email chain dated April 12, 2021, between [the plaintiff] and his attorney . . . .

"[The plaintiff] testified that, at the time this supplement was being circulated, he did not know that [Hawks-Ladds] was not representing him. . . . [The plaintiff] did not notice the differences in the several drafts of the Novick agreement or that the references to the supplement in the original drafts had been removed." (Citations omitted; emphasis altered; footnote omitted.)

At the request of counsel, the arbitrator listened to "the entire taped conversation" of Novick's December 3, 2020 performance review conducted by the plaintiff. The arbitrator found that this review "confirm[ed] . . . that [the plaintiff's] statements and misrepresentations on the Novick matter support" the conclusion that WorldQuant had cause to terminate the plaintiff's employment under the employment agreement. As the arbitrator found, "[t]he tape gives no hint that Novick was about to be terminated . . . . The tape documents representations [the plaintiff] made about equity, and

they discussed options and profits interest, although he later denied such statements. . . . [T]he two key areas where [the plaintiff] was not truthful are apparent: that is, the review was positive despite [the plaintiff's] intent to terminate Novick; and there was 'equity promised or implied,' despite [the plaintiff's] later denial. . . . These statements are material and are directly contradicted by [the plaintiff's] explanations in the document he prepared for counsel to respond to Novick's attorney. . . . That document includes misrepresentations and is reflective of [the plaintiff's] overall credibility throughout this proceeding." (Citations omitted; emphasis omitted.) The arbitrator further found that there was "no evidence that [the plaintiff's] termination was . . . done to avoid payment of vested or unvested equity. It was a reaction to the material breach of [the plaintiff's] responsibilities as [chief executive officer] and the resulting loss of trust [in him]."

In evaluating the plaintiff's breach of the duty of good faith and fair dealing counterclaim, the arbitrator correctly observed that "the key question . . . is whether [WorldQuant] acted in bad faith." The arbitrator noted that "the investigation and termination process [WorldQuant] followed is not ideal human resources practice. And the conduct of [WorldQuant] in failing to provide the Novick supplemental agreement to [the plaintiff] is troubling to say the least. But [the plaintiff's] own behavior and lack of credibility in his testimony about his sharing of the related emails with his counsel . . . compounds the situation. Neither side has clean hands."[17] The arbitrator then concluded that, "[a]lthough the termination and related events were poorly handled,

---

[17] In light of his determination in the liability decision that "[n]either side has clean hands," the arbitrator awarded far less than the $2,820,169.13 in total relief sought by the defendants. In the damages decision, the arbitrator explained that he was exercising his equitable power to reduce the defendants' total award to $690,578.60 because they did not have clean hands.

they do not rise to the level of dishonest or sinister motive sufficient to meet the required bad faith standard. [WorldQuant] has not breached the covenant of good faith and fair dealing." (Emphasis omitted.)

Although the plaintiff does not agree with the arbitrator's finding that WorldQuant's conduct did not rise to the level of bad faith, "[a] party's mere disagreement with the [arbitrator's] interpretation and application of established legal principles is a far cry from the egregious or patently irrational misperformance of duty that must be shown in order to prove a manifest disregard of the law . . . ." (Internal quotation marks omitted.) *Saturn Construction Co.* v. *Premier Roofing Co.*, 238 Conn. 293, 308, 680 A.2d 1274 (1996). In the present case, the arbitrator set forth the proper legal principles governing the duty of good faith and fair dealing and made detailed findings with respect to the conduct of both the plaintiff and WorldQuant based on his review and credibility assessment of the documentary and testimonial evidence presented at the arbitration proceeding.[18] Accordingly, this is not a case in which the arbitrator ignored clearly applicable law. See, e.g., *Blondeau* v. *Baltierra*, supra, 337 Conn. 162. The plaintiff's claim that the arbitrator manifestly disregarded the law, therefore, is unavailing.

## IV

The plaintiff claims that the court improperly failed to vacate the arbitration award because the arbitrator acted in manifest disregard of the law by misapplying the after-acquired evidence doctrine. Because the arbitrator found that the defendants had notice prior to the

---

[18] We reiterate that, in considering a manifest disregard of the law claim pursuant to § 52-418 (a) (4), our courts apply "the standard of review applicable to unrestricted submissions"; *Blondeau* v. *Baltierra*, supra, 337 Conn. 154; and "will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact." (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 80.

decision to terminate the plaintiff's employment that he had provided consulting services to HXS during the course of his employment with WorldQuant, the plaintiff maintains that the proper application of the after-acquired evidence doctrine compels the conclusion that the defendants waived any claim with respect to that conduct. We disagree.

Known also as the "after-acquired evidence defense"; see, e.g., *Miller Plastic Products, Inc.* v. *National Labor Relations Board*, 141 F.4th 492, 520 (3rd Cir. 2025); *Tilkey* v. *Allstate Ins. Co.*, 56 Cal. App. 5th 521, 563, 270 Cal. Rptr. 3d 559 (2020); the after-acquired evidence doctrine "is equitable in nature and is usually applied in a situation involving termination or another adverse employment action to ensure that an employee does not benefit from the employee's own misconduct or misrepresentation. The rationale of the cases applying the [doctrine] is that a plaintiff who was not entitled to the employment in the first place cannot claim economic damages for the loss of it." (Internal quotation marks omitted.) *Silberstein* v. *Pro-Golf of America, Inc.*, 278 Mich. App. 446, 461, 750 N.W.2d 615 (2008), appeal denied, 483 Mich. 886, 759 N.W.2d 882 (2009). As the United States Court of Appeals for the Eighth Circuit explained, the after-acquired evidence doctrine "applies when an employee is fired for an unlawful reason but the employer later learns of other conduct that, by itself, would have resulted in discharge had it come to the employer's attention . . . . It is the employer's burden to prove that it would have fired the employee upon discovery of the evidence." (Citation omitted.) *Smith* v. *AS America, Inc.*, 829 F.3d 616, 625–26 (8th Cir. 2016). "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must . . . establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had

known of it at the time of the discharge." *McKennon* v. *Nashville Banner Publishing Co.*, 513 U.S. 352, 362–63, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995).

The after-acquired evidence doctrine typically is utilized by defendants as a shield to minimize or bar recovery by a plaintiff pursuing a wrongful discharge claim. See, e.g., *O'Brien* v. *Ohio State University*, 139 Ohio Misc. 2d 36, 42, 859 N.E.2d 607 (2006) ("[u]nder the after-acquired evidence doctrine, when an employer wrongfully terminates an employee but later learns that good cause for termination then existed, the after-acquired evidence doctrine operates to either lessen or bar the employee's recovery of damages"), aff'd, 2007 WL 2729077 (Ohio App. September 20, 2007), appeal denied, 117 Ohio St. 3d 1406, 881 N.E.2d 274 (2008); see also *Crawford Rehabilitation Services, Inc.* v. *Weissman*, 938 P.2d 540, 547 (Colo. 1997) ("[t]he after-acquired evidence doctrine shields an employer from liability or limits available relief where, after a termination, the employer learns for the first time about employee wrongdoing that would have caused the employer to discharge the employee"); *Gassmann* v. *Evangelical Lutheran Good Samaritan Society, Inc.*, 261 Kan. 725, 727–28, 933 P.2d 743 (1997) (holding that employee was not entitled to any relief if employer could establish after-acquired evidence sufficient for termination of employment); *McDill* v. *Environamics Corp.*, 144 N.H. 635, 640–41, 757 A.2d 162 (2000) (noting that "[s]ome jurisdictions permit after-acquired evidence to serve as a complete bar to an employee's recovery, while other jurisdictions apply the after-acquired evidence doctrine only to mitigate an employee's damages" and then holding that "in a breach of contract action after-acquired evidence of employee misconduct is a defense to a breach of contract action for wages and benefits lost as a result of discharge if the employer can demonstrate that it would have fired

the employee had it known of the misconduct" (internal quotation marks omitted)); R. White & R. Brussack, "The Proper Role of After-Acquired Evidence in Employment Discrimination Litigation," 35 B.C. L. Rev. 49, 94 (1993) ("[a]fter-acquired evidence has rapidly developed into a powerful defense tactic for employers").

The United States Supreme Court has held, as a matter of federal law in the employment discrimination context, that when an employer meets its burden under the after-acquired evidence doctrine, "neither reinstatement nor front pay is an appropriate remedy [for a wrongly discharged employee]. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *McKennon* v. *Nashville Banner Publishing Co.*, supra, 513 U.S. 361–62; see also *Stone Key Group*, *LLC* v. *Taradash*, 204 Conn. App. 55, 95, 328 A.3d 159 ("[i]n the federal system, as a general rule, after acquired evidence is relevant to the relief due a successful plaintiff in an employment discrimination discharge case" (internal quotation marks omitted)), cert. denied, 338 Conn. 912, 259 A.3d 653 (2021), and cert. denied, 338 Conn. 912, 259 A.3d 653 (2021). This court has adopted that precept as a matter of state law with respect to damages awarded in the context of a wrongful discharge action brought by an employee against an employer. See *Preston* v. *Phelps Dodge Copper Products Co.*, 35 Conn. App. 850, 856–61, 647 A.2d 364 (1994).

The procedural posture of the present case stands in stark contrast to that precedent. Here, it was the employer that commenced this arbitration proceeding and subsequently augmented the original complaint with additional allegations regarding the conduct of its employee in providing consulting services to an outside

company in contravention of the employment agreement.[19] In the liability decision, the arbitrator found that the plaintiff entered into a consulting agreement with HXS while employed by WorldQuant and that Blomberg and others at WorldQuant had knowledge about that relationship prior to the termination of the plaintiff's employment. The arbitrator also found that the defendants were unaware that the plaintiff received substantial compensation from HXS until after his dismissal. As the arbitrator stated: "Although [the plaintiff] does not appear to have attempted to conceal the HXS deal, he did not provide the [consulting agreement] or notice of this project or the fee to [the defendants]. . . . [The defendants discovered] the details of [the plaintiff's consulting agreement with HXS] in January, 2022, as part of the discovery for this arbitration. . . . Receiving $115,000 is more than de minimus and is a material breach of the provision of the employment agreement that required him to work full-time for [WorldQuant] unless he received permission to do otherwise." (Citations omitted.) Accordingly, as a factual matter, this is not a case in which the defendants had knowledge at the time of the termination of the plaintiff's employment

---

[19] The plaintiff's employment agreement provides in relevant part: "Your employment shall be on a full-time basis, which means that you shall devote your full time to your employment during normal working hours, and not carry on other business activities at any time that are competitive or that may interfere in any manner with the business of [WorldQuant]. Subject to the foregoing, and without limiting your obligations set forth in Section B below, it is acknowledged and agreed that you may engage in the 'permitted activities' listed on Schedule 2; provided that (i) such activities be and remain de minimis in nature; (ii) you may not accept cash compensation in connection with any such 'permitted activity' and (iii) you shall promptly notify [WorldQuant's] [b]oard of [m]anagers, in writing, in the event that your status changes with respect to any such 'permitted activity.' No other business activity shall constitute a 'permitted activity,' unless so determined by [WorldQuant's] [b]oard of [m]anagers in its sole discretion." Schedule 2 of the employment agreement lists six entities by name and specifies the nature of the plaintiff's activities in connection therewith. HXS is not one of the listed entities.

that he was receiving substantial compensation from HXS. Rather, that knowledge was acquired after this arbitration proceeding commenced.

The present case is further distinguishable from case law on the after-acquired evidence doctrine due to the fact that the termination notice provided to the plaintiff contained a reservation of rights clause, which provides: "Please be advised that [WorldQuant] . . . reserve[s] all of its rights under the [e]mployment [a]greement . . . at law or otherwise, and nothing in this letter shall be construed as a modification, release or waiver of any rights or claims." In the liability decision, the arbitrator expressly weighed the plaintiff's claim that application of the after-acquired evidence doctrine compelled the conclusion that the defendants waived any claim regarding his consulting work with HXS against the defendants' claim that there was no waiver due to the reservation of rights in the termination notice. The arbitrator noted that "courts in Connecticut have recognized that a reservation of rights in other contexts can allow consideration of additional issues that are related to the initial reasons given," citing to *McCulloch* v. *Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 188 (D. Conn. 2005). The arbitrator then found that the issue of the plaintiff's consulting work with HXS did "relate to the reasons given for the termination of [the plaintiff's employment], which were allegations of policy violations in breach of the employment agreement. Here the breach was of a fundamental component of the employment agreement—the duty not to work for pay from another entity. Unlike some cases where courts have held that by failing to assert a specific reason for termination, the party waives its rights to do so later, here [WorldQuant] reserved its rights." The arbitrator further noted that he "is unaware of contrary

precedent on waiver under Connecticut law." The arbitrator thus concluded that "[t]here was no waiver in this case" by the defendants.[20]

In light of the foregoing, we conclude that the plaintiff has not met his burden of demonstrating that the arbitrator manifestly disregarded the law. He has not overcome the "high hurdle"; *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 102; of showing that the governing law on waiver is well-defined, explicit, and clearly applicable in situations in which both the after-acquired evidence doctrine and a reservation of rights clause are implicated, that an obvious error existed that was capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator, or that the arbitrator appreciated yet ignored a clearly governing legal principle. See *Blondeau* v. *Baltierra*, supra, 337 Conn. 161–62. Accordingly, the plaintiff has not established that the court improperly denied his appli-

---

[20] In addition, we note that, outside the context of employment discrimination actions; see, e.g., *McKennon* v. *Nashville Banner Publishing Co.*, supra, 513 U.S. 354; the after-acquired evidence doctrine arguably is inapposite when an employer terminates an employee for cause and thereafter seeks to supplement the grounds for termination. As the Restatement (Second) of Agency provides, "[a] principal is privileged to discharge before the time fixed by the contract of employment an agent who has committed such a violation of duty that his conduct constitutes a material breach of contract . . . ." 2 Restatement (Second), Agency, § 409 (1), p. 258 (1958). The commentary to that section notes that, "[i]f a principal has cause for the discharge of an agent and discharges him, the fact that the principal is not at the time aware that he has cause for discharge is immaterial." Id., comment (e), p. 261. The Restatement of Employment Law similarly provides that "[a]n employer has cause for early termination of an agreement for a definite term of employment if the employee has materially breached the agreement . . . ." Restatement, Employment Law, § 2.04 (a), p. 71 (2015). As that treatise explains, "under the approach adopted by this Restatement, the employer must always establish the basis for cause. . . . Some decisions require that the employer's stated justification be the actual reason for the termination, although the traditional rule is that the employer's motivation is irrelevant as long as adequate cause in fact existed at the time of dismissal." (Citation omitted.) Id., reporter's note to comment (e), p. 80.

cation to vacate or improperly granted the defendants'
application to confirm the arbitration award.

The judgments are affirmed.

In this opinion the other judges concurred.